**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHRISTINE MOORE,                              Case No. 1:18-cv-261

    Plaintiff,                              Bowman, M.J.

           vs

JASON SCOTT*, et al.*,

    Defendants.

**MEMORANDUM OF OPINION AND ORDER**

Plaintiff filed this civil rights action against Defendants Sgt. Jason Scott, Officer Robert Bohl and the City of Cincinnati alleging that her constitutional rights were violated due to her involuntary mental health commitment. This matter is now before the Court on Defendants' motion for summary judgment and the parties' responsive memoranda. (Docs. 31, 35[1], 36, 37). The parties have consented to disposition of this matter by the Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 17).

**I.     Background and Facts**

In January 2017, Plaintiff contact the City of Cincinnati Police because she believed that several of her neighbors were keying[2] her car. She contacted the police to file a complaint. However, after an investigation, Sgt. Scott determined that the damage

---

[1] Plaintiff's memorandum in opposition to Defendants' motion for summary judgment also included a motion for leave to amend complaint to correct Defendant Bohl's name. In this regard, Plaintiff's complaint mistakenly named Officer "Boyles" instead of Officer Bohl as the officer who responded to her apartment on the day she was transported to UC Medical Center. In her memorandum in opposition to Defendants' motion for summary judgment Plaintiff seeks to amend her complaint to correct her typographical error in naming Officer "Boyles" instead of Officer Bohl. Defendants oppose Plaintiff's request asserting that Plaintiff's request is futile. Plaintiff's request is well-taken. Defendants were clearly put on notice that Officer Bohl was the proper Defendant. Notably, Defendants' motion for summary judgment addressed Plaintiff's claims against Bohl on the merits.

[2] "Keying a car" is commonly known to be the act of taking the sharp edge of one's traditional car key and scratching it along the side of a car.

did not appear to be from someone keying her car, nor was there any evidence that any of her neighbors caused the damage. Sgt. Scott then spent over an hour talking with the Plaintiff about his conclusions. (Id. at ¶ 8-9).

In April of 2017, Plaintiff called the police again to make a new complaint of criminal damaging. Sgt. Scott directed Officer Robert Bohl to investigate the new complaint. (Id. at. ¶ 11). Because of Sgt. Scott's previous interactions with Plaintiff, he suggested that Officer Bohl take Chris Dearth with him to observe and evaluate Plaintiff while Officer Bohl investigated Plaintiff's complaint. (Doc. 30, Bohl Dec. ¶¶ 8-10; Doc. 30, Ex. 2, Scott Dec. ¶ 11). Mr. Dearth is a trained and certified mental health worker employed by the University of Cincinnati Hospital Medical Center (UCMC) who is assigned to District 5 as a mobile crisis team member. Officer Bohl and Mr. Dearth responded to Plaintiff's residence and investigated the complaint. (Doc 30, Ex. 1, Bohl Dec. ¶¶ 17-19).

Plaintiff took Officer Bohl and Mr. Dearth to the garage. Officer Bohl did not see any damage that he believed came from someone keying her car. In his opinion, based on his prior experiences investigating these types of complaints, the damage to her vehicle instead appeared to be minor marks caused by road debris impacting the paint. (Doc. 30, Ex.1, Bohl Dec. ¶¶ 27-30). Officer Bohl did not find any evidence that the damage was caused by Plaintiff's neighbors. Plaintiff showed Officer Bohl pictures from a deer camera she had set up in the garage to surveil her vehicle. However, the pictures did not show anyone damaging her car, despite her insistence that they did. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 17-19).

Plaintiff led Officer Bohl and Mr. Dearth back to her apartment, where she continued to explain her belief that her neighbors were conspiring against her. She

indicated that she was significantly stressed by the situation and had been fasting and praying to assist her in the fast. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 32-34). When Officer Bohl and Mr. Dearth entered Ms. Moore's apartment, a handgun was sitting out on a table. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 21-22, Doc. 35, Ex. 1, Moore Dec. ¶16). Officer Bohl dissembled the gun. (Doc. 35, Ex. 1, Moore Dec. ¶16).

Plaintiff indicated she had confronted her neighbor about the damage to her vehicle while carrying the handgun. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 23). She indicated she would use the firearm if her neighbor "came at her." (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 23). There was also a samurai sword in the apartment. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 24; Doc. 35, Ex. 4, Moore Decl. ¶20).

Believing Plaintiff was a threat to others (and possibly herself if she confronted someone based on her alleged delusions), Mr. Dearth signed an emergency involuntary commitment order under Ohio Revised Code Chapter 5122 for Plaintiff to be evaluated at UCMC. (Doc. 30, Ex. 1, Bohl Dec. ¶ 37; Doc. 30, Ex. 4, PageID 332). When there was a delay in a uniformed officer arriving to take Plaintiff to the hospital, Sgt. Scott came to the scene to try to expedite the transport so that Plaintiff could be more fully evaluated by medical professionals in a more appropriate setting. (Doc. 30, Ex. 2, Scott Dec. ¶¶ 16-17; Doc. 30, Ex. 1, Bohl Dec. ¶ 41).

Officer Bohl placed Plaintiff's gun on a temporary hold during the pendency of the mental evaluation. (Doc. 30, Ex. 1, Bohl Dec. ¶43). Upon her release from the hospital, Officer Bohl authorized the gun to be released back to her. (Id. At ¶44). In fact, Plaintiff picked it up the next day. (Doc. 34, Ex. 1, Moore Dec. ¶32).

Plaintiff underwent medical assessments for approximately five hours at the UCMC's Emergency Department. (Doc. 35, Ex. 1, Moore Aff. at ¶ 26).  She admitted to making the statements about confronting her neighbors with a gun in her possession. In fact, the records indicate she stated "she had the gun with her when she confronted the neighbor in case she needed it, but things went as she had hoped and there was no need. (Doc. 30, Ex. 4, Hospital Records, PageID 319). Emergency Department treatment records indicate that she did not have suicidal or homicidal ideation. (Id. at PageID 273-274).  The medical records do state in the triage screening notes that Plaintiff has "acute agitation, anxiety or insomnia" which has been occurring for 2-3 days with mild severity. (Doc. 35, Ex. 4, PageID 388).  Plaintiff was released to her daughter, who met Plaintiff at the hospital, with instructions to follow up with her healthcare provider as needed and provided psychiatric resources, "should she feel inclined to seek help." (Id. at 385).

On April 12, 2018, Plaintiff filed the instant six count Complaint against Sgt. Scott, Officer John Bohl and the City of Cincinnati. (Doc. 1). Plaintiff alleges claims under 42 U.S.C. § 1983 against Defendants Scott and Bohl for violations her constitutional rights based upon on her involuntary mental health commitment and as well has the confiscation of her gun by Defendants.  Plaintiff's complaint also alleges a 42 U.S.C. § 1983 claim against the City for failure to train. Plaintiff finally alleges claims state claims under the Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744, and for emotional distress.

### II. Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the non-moving

party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to survive summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The court determines whether the evidence requires submission to a jury, or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

Although reasonable inferences must be drawn in favor of the opposing party, *see id.* at 255, said party must present significant probative evidence tending to support the complaint. *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 290, 88

5

S.Ct. 1575 (1968). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). In other words, the mere existence of a scintilla of evidence to support the nonmoving party's position will be insufficient to defeat a well-supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

### III. Analysis

Defendants argue that they are entitled to summary judgment because there are no questions of material fact, thus entitling them to judgment as a matter of law. Defendants contend that both individual police officers involved in this case are entitled to qualified immunity. Defendants further contend that there is no evidence to support any claim against the City for an unconstitutional policy or practice. Next, Defendants contend the City is entitled to immunity on the state law claims under the Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744. Finally, Defendants argue that there is no evidence of extreme emotional distress for which damages can be awarded. Upon careful review, the undersigned finds that Defendants' motion for summary judgment is well taken.

### A. *Qualified Immunity*

As noted above, Defendants assert that they are entitled to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982). Qualified immunity not only insulates government officials from individual liability for money damages, but from the burdens and expenses of litigation and trial. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001). The doctrine is intended to balance the following competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009).

Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S.Ct. 1092 (1986)). See also *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). Qualified immunity applies regardless of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

"To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation." *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 599-600 (6th Cir. 2020) (citing *Pearson*, 555 U.S. at 231-32).

1. *Constitutional Violation – involuntary commitment*

To decide whether Plaintiff has presented evidence of a violation of her constitutional rights, the Court must first determine the source of the claimed right. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir.2002). The Fourth Amendment grants citizens the right to be free from unreasonable searches and seizures by government officials. U.S. CONST. amend. IV; *Gardenhire v. Schubert*, 205 F.3d 303, 312–13 (6th Cir.2000). Here,

it is undisputed that Plaintiff was seized within the meaning of the Fourth Amendment due to her involuntary commitment for Plaintiff's evaluation at UCMC.

Ohio law authorizes the involuntary commitment of individuals who are suspected of being mentally ill. Ohio Revised Code Chapter 5122 provides two different procedures which may be used to accomplish an involuntary commitment of that person. The first procedure, which occurred in the current situation, is an emergency hospitalization procedure conducted pursuant to the guidelines found in Ohio Rev. Code § 5122.10. Ohio Rev. Code § 5122.10 states:

> A police officer may take a person into custody, and may immediately transport him to a hospital, if the police officer has reason to believe that the person is a mentally ill person subject to hospitalization by court order under division (B) of section 5122.01 of the Revised Code, and represents a substantial risk of physical harm to himself or others if allowed to remain at liberty pending examination.

> Ohio Rev. Code § 5122.10 requires that 'a written statement shall be given to such hospital by the police officer stating the circumstances under which such person was taken into custody and the reasons for the police officer's belief.

*In re Miller*, 63 Ohio St.3d 99, 585 N.E.2d 396, 400 (Ohio 1992)(quoting Ohio Rev. Code § 5122.10). The written statement serves as an affidavit to ensure that probable cause exists, and that the seizure is necessary. *Id.* When there is probable cause for the commitment, there is no unconstitutional seizure. *Simon v. Cook*, 261 F.App'x 873, 879 (6th Cir.2008). "[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997) (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)). "[B]ecause 'probable cause is a fluid concept[,] turning on the assessment of probabilities in particular factual contexts,'

courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." *Id.*

In *Monday v. Oullette*, the Sixth Circuit determined that the "Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997); *accord Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir.1997) (per curiam). Notably, "a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." *Simon*, 261 Fed. App'x at 881, fn 4, quoting *Monday,* 118 F.3d at 1102. The analysis must evaluate probable cause "from the perspective of a reasonable and objective person in the position of the seizing official." *Id*.

Thus, the outcome of the hospital's later evaluation is not part of the probable cause inquiry. However, those records may properly be used to inform the analysis of whether the Officers acted objectively reasonably. *See Simon*, 261 Fed. App'x at 886 (allowing discovery of patient-therapist communications because even though they are not part of the probable cause inquiry, they "may inform our analysis" of whether a seizing official's view of an individual's mental state on the day of the mental health seizure was objectively reasonable).

Here, Defendants contend that there was probable cause for Plaintiff's emergency involuntary commitment. Notably, Mr. Dearth, the UCMC mental health worker who signed the commitment order, found that Plaintiff had a paranoid level of delusion, access to a firearm and a sword, had previously confronted the individuals who she had paranoid delusions regarding, and stated an intention of doing it again if she felt threatened. (Doc.

30, Ex. 1, Bohl Dec. ¶¶ 16-24; 25-30). If fact, the Statement of Belief singed by Mr. Dearth

states, in relevant part, as follows:

> Pt [patient] has been calling police stating her upstair[s] neighbors are keying her car. Pt also believes people are using drugs in the building…Pt had a small hand gun on her table when we arrived. Pt admits to having an oral confrontation with this neighbor and having the gun with her. Pt stated "If he had moved toward me I would have shot him." Pt has video of her garage but believes her neighbors "erased the photos" of her car being keyed. There doesn't appear to be any evidence on the video. Pt's delusions and paranoia appear to make her a risk to others at this time. Pt. reports this has been happening for 10 years.

(Doc 30-4, PageID# 332).

As noted above, when officers arrived at Plaintiff's apartment, a handgun was

sitting out on a table. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 21-22). Plaintiff reported she

confronted her neighbor about the damage to her vehicle while carrying the handgun and

that she would use the firearm if her neighbor "came at her." (Doc. 30, Ex. 1, Bohl Dec.

¶¶ 23). Defendants also observed a samurai sword in the apartment. (Doc. 30, Ex. 1,

Bohl Dec. ¶¶ 24). Additionally, upon investigation, Defendants found no evidence of

keying – the damage to her vehicle instead appeared to be minor marks caused by road

debris impacting the paint. (Doc.30, Ex.1, Bohl Dec. ¶¶ 27-30). Defendants also found no

evidence that the damage was caused by her neighbors. Plaintiff offered pictures from a

deer camera she had set up in the garage to surveil her vehicle to Officer Bohl. However,

the pictures did not show anyone damaging her car, despite her insistence that they did.

(Doc. 30, Ex. 1, Bohl Dec. ¶¶ 17-19).

Plaintiff led Officer Bohl and Mr. Dearth back to her apartment, where she

continued to explain her belief that her neighbors were conspiring against her. She

indicated that she was significantly stressed by the situation and had been fasting and

praying to assist her with the fast. (Doc. 30, Ex. 1, Bohl Dec. ¶¶ 32-34). Believing Plaintiff was a threat to others (and possibly herself if she confronted someone based on her delusions), Mr. Dearth signed an emergency involuntary commitment under Ohio Revised Code Chapter 5122 for Plaintiff to be evaluated at UCMC. (Doc. 30, Ex. 1, Bohl Dec. ¶ 37).

Plaintiff disputes both that she displayed any irrational or dangerous behavior. She contends that the Officers unreasonably came to a "predetermination" about her need for further evaluation at UC Medical Center. (Doc. 35, at 19). In an effort to show that the Officers fabricated a fictitious narrative that she was acting irrationally, she claims she had "well-founded concerns about physical damage to her vehicle documented through insurance claims." (Doc. 35, at 9). In this regard, attached to her own affidavit was a "preliminary" estimate from her insurance company which appears to indicate that her vehicle had been vandalized. (Doc. 35, Ex. 2). However, there are no photographs, statements or police reports attached to the estimate or to Plaintiff's declaration. Plaintiff has offered nothing more than her unsupported, contradicted, and self-serving allegations that her neighbors were damaging her vehicle.

In her letter/complaint to the Citizen Complaint Authority Director, Plaintiff details how she purchased three car cameras, an outside camera, and twice hired a private investigator. (Doc. 35, Ex.3, PageID 418). She also details how her landlord installed "a very expensive camera" but that the building manager failed to monitor it. (Id. at 418-419). She then further asserts that the cameras she had installed in her garage were somehow connected to someone else's computer without her consent and that that person then deleted the pictures that captured the neighbors damaging her car. (Id. at 419). Plaintiff

11

also indicated in her letter to the Citizen Complaint Authority that she had damage to the interior of her vehicle, but she made a decision not to show that alleged damage to the defendants. (Id. at 420).  Plaintiff does not discuss these alleged facts in her brief or in her affidavit.

Although ultimately Plaintiff was "not deemed to be an imminent threat of harm to self or others" (Doc. 30, Ex. 4, PageID 281), the medical records provide support for the reasonableness of Officer Bohl's decision to seek an examination.  In the notes from the Emergency Department, Janet Evans, Psychiatric Social Worker, wrote, "Pt reported to MCT [mobile crisis team] that she has been smelling odd smells in her home and thinks that her neighbors are coming into her apartment and doing things that are causing bad odors. Pt states she has moved from another apartment where the same things were happening. Pt reported that the son of a past acquaintance had come into her room at night and was licking her." (Doc. 30, Ex.4, PageID 282 and 286.)

The record contains testimony from Sgt. Scott that states in his prior interactions with Plaintiff she complained about her vehicle being keyed by neighbors, but the damage did not appear to be the result of keying and there was no evidence that the damage was made by a neighbor.  (Doc. 30, Ex. 2, Scott. Decl ¶ 8).  Sgt. Scott further reported that based on his interactions with Plaintiff, he believed that Plaintiff's "thinking was not ordered because she seemed confused and talked about a few different groups of people targeting her for different reasons."   Id. at ¶10.

As cited by Defendants, in *Monday*, "a showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." 118 F.3d at 1102 (quoting *Illinois v.*

*Gates,* 462 U.S. 213, 245 n. 13 (1983)). Moreover, "because 'probable cause is a fluid concept[,] turning on the assessment of probabilities in particular factual contexts,' courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." *Id.*  Here, the Officers reasonably based their actions on their own observations of Plaintiff, including what they reasonably believed to be her unfounded and irrational statements about a neighbor vandalizing her vehicle; their observations of Plaintiff's vehicle, which they believed showed signs of light scuff marks from road debris; their observations of weapons lying within Plaintiff's reach; and Plaintiff's statements about her readiness to use one of those deadly weapons, i.e., a loaded handgun, if she felt threatened.

Plaintiff attempts to distinguish the case law cited by Defendants by arguing that in those cases the plaintiffs were clearly a danger whereas here Plaintiff was not and that in those cases someone other than the plaintiffs contacted the police to report the concerning conduct that ultimately led to the temporary mental health commitment. It is undisputed that the Plaintiff here contacted the police to report her car being damaged. (See Doc. 35, PageID 354-355). However, that distinction makes little difference in the analysis. Plaintiff does not cite to a case that supports that argument and this court has not found one.  Regardless of why a police interaction begins, Ohio Rev. Code 5122.10 provides that "a police officer may take a person into custody, and may immediately transport him to a hospital, if the police officer has reason to believe that the person is a mentally ill person…and represents a substantial risk of physical harm to himself or others…". To adopt Plaintiff's argument would unreasonably limit a police officer's ability to initiate an involuntary emergency commitment.

In light of the foregoing, Defendants actions were reasonable under the circumstances. Therefore, probable cause existed for Plaintiff's involuntary commitment. Because there was no constitutional violation, Defendants are entitled to qualified immunity.

   *2. Constitutional Violation – Seizure of Plaintiff's Gun*

   Plaintiff also claims that Officer Bohl violated her rights under the Fourth Amendment when he inspected and seized her handgun. Defendants assert that they are entitled to qualified immunity with respect to this claim. As detailed above, Defendants had probable cause for Plaintiff's emergency involuntary commitment and therefore did not violate her constitutional rights under the Fourth Amendment. The removal of the gun from the Plaintiff's premises was reasonable under the circumstances. As Defendants correctly argue several courts have rejected claims that warrantless seizure of a firearm during the pendency of an involuntary emergency commitment violates the Fourth Amendment. *See Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008); *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1139 (9th Cir. 2019); *Torcivia v. Suffolk Cty.*, 17 F.4th 342, 358 (2d Cir. 2021). These courts reasoned that under the circumstances, the warrantless seizure was reasonable under the community caretaker exception to the warrant requirement. See also *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996) (recognizing police officers often take on roles as community caretakers).

   Even if this court were to find that the temporary seizure of Plaintiff's firearm to be a violation of her Fourth Amendment right, the right is not one that is clearly established given the case law that supports a police officer's warrantless seizure of a firearm in the context of a mental health hold.

Plaintiff next argues, as a licensed handgun owner, her constitutionally protected rights under the Second Amendment were also violated when her gun was seized. Defendants argue that no constitutional violation occurred.  Plaintiff failed to provide any caselaw to show a clearly establish a right to keep a firearm in the context of a mental health seizure. *See Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (stating plaintiff must demonstrate that (1) a constitutional right was violated and (2) that right was clearly established at the time of the violation); see also R.C. 2925.13(A)(5) (barring a mentally ill person subject to court order under disability from possessing a firearm).

As noted above, the burden rests with Plaintiff to prove the Officers are not entitled to qualified immunity. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). She has failed to do so here.  Namely, Plaintiff has provided no basis in law for her contention that the temporary seizure of her firearm violated her Fourth Amendment rights or deprived her of her Second Amendment right to bear arms.  In light of the foregoing, the undersigned finds that Defendants are entitled to qualified immunity with respect to Plaintiff's 42 U.S.C. § 1983 against Defendants Scott and Bohl.[3]

---

[3] To the extent that Plaintiff's complaint alleges a civil conspiracy under § 1983, Defendants contend that there is insufficient evidence for a jury to conclude there was a conspiracy surrounding Sgt. Scott's decision to send a mental health worker with Officer Bohl to Plaintiff's residence, and in the alternative, they are entitled to qualified immunity because the officers acted reasonably.  In her memorandum contra, Plaintiff however, contends that she does not allege a claim of civil conspiracy in her Complaint, and instead maintains that Sgt. Scott directly violated her rights under the Fourth Amendment by deciding to send a mental health worker along with Officer Bohl without any evidence that she was experiencing mental health issues. She also argues that he further violated her rights under the Fourth Amendment by arranging for her transportation to the hospital, despite her repeated denial of any mental health issues to Officer Bohl. (Scott. Dec., Doc. 30, Ex. 2, at ¶¶ 16-17).  Plaintiff's unsupported argument fails as a matter of law. As noted above, the burden rests with Plaintiff to prove the Officers are not entitled to qualified immunity. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). She has failed to do so here.

B.  *Unconstitutional Policy or practice*

The City contends that it is entitled to judgment as matter of law with respect to Plaintiff's failure to train claim.  As noted above, Plaintiff alleges that the City failed to properly train its officers on the relevant involuntary commitment standard and the need to demonstrate probable cause of a threat of physical harm in order to involuntarily commit a person on an emergency basis for evaluation.

A municipality is not vicariously liable for the unconstitutional actions of its employees or agents. *Gregory v. Shelby Cnty., Tenn.,* 220 F.3d 433, 441 (6th Cir. 2000) (*citing Monell v. Dep't of Social Srvs. of City of New York*, 436 U.S. 658, 694 (1978)). A local government entity can only be held liable for a constitutional violation under § 1983 when that violation can be attributed to the enforcement of a local government policy, practice, or decision of a final local government policy maker. *See Monell*, 436 U.S. at 694. "[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986).

A plaintiff must also demonstrate that the official policy resulted in the violation of plaintiff's constitutional rights. *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007); Gregory, 220 F.3d at 441 ("For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort."). Without a constitutional violation, there is no causation between the alleged unconstitutional policy and the harm to the plaintiff. Id. Only when a political subdivision's failure to train rises to the level of "deliberate indifference" does this failure become a "policy or custom that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

To state a § 1983 claim based on a failure to train, a plaintiff must prove:

> (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. We have further elaborated that, "[t]o show deliberate indifference, Plaintiff[s] must show prior instances of unconstitutional conduct demonstrating that the [city] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."

*Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (*quoting Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

A plaintiff must establish the inadequacy of the training, even if it is the defendant who moves for summary judgment. That is because a defendant is not required to "support their motion ... with evidence negating plaintiffs' claim." *See Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 564 (6th Cir. 2011). Moreover, with regard to the plaintiff's burden, a mere showing that the harm at issue could have been avoided through more training is insufficient, in and of itself, to show inadequate training. *See Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (noting the plaintiff "cannot meet her burden of proof by showing ... that harm could have been avoided if the nurse had better or more training") (quotations omitted). In other words, there must be some showing that the training fell below an objectively reasonable level, not merely a post hoc assumption that, because a harm occurred, the training was necessarily inadequate, or that more training would have led to a better result. Similarly, the mere fact that a municipal employee is unfamiliar with a policy is insufficient, on its own, to create a genuine dispute as to whether the actor received inadequate training on the policy. *Anderson v. Jones*, 440 F. Supp. 3d 819, 836 (S.D. Ohio 2020).

Defendants argue that there is no evidence of an unconstitutional policy or practice that would demonstrate deliberate indifference by the City to Plaintiff's constitutional rights.  Defendants contend that the City did not fail to train its officers about involuntary commitments under Ohio law, and there is no evidence of an unconstitutional practice or custom of involuntary commitments.  The undersigned agrees.

Notably, O.R.C. § 5122.10(C) provides:

> Every reasonable and appropriate effort shall be made to take persons into custody in the least conspicuous manner possible. A person taking the respondent into custody pursuant to this section shall explain to the respondent: the name and professional designation and affiliation of the person taking the respondent into custody; that the custody-taking is not a criminal arrest; and that the person is being taken for examination by mental health professionals at a specified mental health facility identified by name.

In support of their motion for summary judgment, Defendants submitted the declaration of Captain Aaron Jones, commander of the training unit for the Cincinnati Police Department. (Doc. 30, Ex. 3, Jones Decl.). According to Jones, there is a unit of training for recruits regarding the legal standard in Section 5122.10 of the Ohio Revised Code for the emergency involuntary commitment of persons as well as its application. (Id. at ¶ 5). Both Officer Robert Bohl and Sgt. Jason Scott received this training when they were recruits. (Id. at ¶ 6).  The Cincinnati Police Department also provides additional training to officers to deal with individuals in crisis because of mental illness.  (Id. at ¶ 7). The Cincinnati Police Department has a policy to handle interactions with the mentally ill. (Id. at ¶ 11). The policy in place on April 13, 2017 indicated officers may only take a person into custody consistent with Ohio Revised Code Section 5122.10 if the suspect is "mentally ill and likely to injury himself/herself or others if allowed to remain at liberty." (Id. at ¶11).

Plaintiff argues that Officer Bohl did not comply with the requirements set forth in O.R.C 5122.10.  Specifically, Plaintiff claims she was never told she was not under criminal arrest, and as a result she asked to speak with her attorney. (Officer Bohl Dec., Doc. 30, Ex. 1, at ¶ 38). Plaintiff further asserts that Officer Bohl also did not specify which mental health facility she was being taken to or that she would be examined by mental health professionals. Plaintiff also claims that she was "escorted out of her home in broad daylight by a uniformed police officer and seated in the backseat of a marked police cruiser in plain sight of her neighbors and other bystanders." (Doc. 35, Moore Affidavit, at ¶ 25). As a result, Plaintiff asserts that Officer Bohl's training as to the involuntary commitment standard was inadequate and led to a violation of Ms. Moore's rights under the Fourth Amendment.

Plaintiff's contention that Officer Bohl failed to comply with the provisions in O.R.C. 5122.10(C) is unavailing.  As noted by Defendants, although Plaintiff contends that she was not told which facility she was being taken to, in her letter to the Citizen's Complaint Authority ("CCA"), Plaintiff expressly stated that "Chris [Dearth] and Detective Bohl said they wanted me to go to UC Hospital because they felt I was stressed." (Doc. 35-5, PageID# 420).  Plaintiff also claims that she was never told that she was not under criminal arrest and Officer Bohl did not adequately explain what he and Mr. Dearth were there for.  However, Plaintiff was permitted to speak with her attorney *before* being transported to UCMC and Plaintiff admits that she eventually complied with their request to be transported to UCMS. (Doc. 35, Ex. 1, Moore Affidavit, ¶23).  Moreover, Plaintiff does not dispute that Officer Bohl and Mr. Dearth spoke with her "in her apartment" away from neighbors and bystanders. (Bohl Aff., Doc. 30-1, PageID# 255).

19

More importantly, as noted above, it is Plaintiff's burden at summary judgment, to come forward with affirmative evidence of a failure to train. Here, Plaintiff does not point to any evidence supported by the record, that indicates Defendants either maintained or maintains a deficient training program or that it failed to train Officer Bohl. Notably, Plaintiff does not dispute the testimony of Cincinnati Police Department's commander in charge of training, Captain Aaron Jones, concerning the training that officers, including Officer Bohl and Sgt. Scott, received. (Doc. 30, Ex. 3).

Furthermore, an officer's noncompliance with O.R.C. 5122.10(C) is insufficient to show the City's deliberate indifference to a need to train officers on determining probable cause for mental health seizures.  *See Harvey v. Campbell Cnty., Tenn*., 453 F. App'x 557, 567 (6th Cir. 2011) (Deliberate indifference based on a single violation of rights requires "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result."). As noted above, Plaintiff does not dispute Captain Jones' testimony, thus leaving uncontroverted his testimony concerning the training of officers on the correct standard for determining that an individual is in need of transport under O.R.C. 5122.10.  Officers made reasonable and appropriate efforts to adhere to the provisions in 5122.10(C). For these reasons, the City is entitled to judgment as a matter of law with respect to Plaintiff's failure to train claim.

*C.  State Law Claims*

Finally, to the extent Plaintiff claims the actions of Defendants violated Ohio state law, the Court declines to exercise pendent jurisdiction over any such claims because Plaintiff fails to state a viable federal law claim. See *United Mine Workers v. Gibbs*, 383

U.S. 715, (1966). *See also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (*quoting*

*Wojnicz v. Davis*, 80 F. App'x 382, 384–85 (6th Cir. 2003) ("If the federal claims are all

dismissed before trial, the state claims generally should be dismissed as well").  Thus,

any state law claims, including claims under the Political Subdivision Tort Liability Act and

claims for emotional distress, should be dismissed without prejudice for lack of

jurisdiction.

### IV. Conclusion

For these reasons, it is **ORDERED** that Defendants' motion for summary judgment

(Doc. 30) is **GRANTED, in toto,** and this matter is **CLOSED.**

         *s/*Stephanie K. Bowman
         Stephanie K. Bowman
         United States Magistrate Judge